UNITED STATES, Appellee,

v.

Staff Sergeant Glenn C. STOKES, 223–19–5233, United States Army, Appellant.

ACMR 9201886.

U.S. Army Court of Military Review.

28 Feb. 1994.

For Appellant: David R. Dowell (argued); Captain Christopher W. Royer, JAGC (on brief); Major James M. Heaton, JAGC, Kenneth D. Neeves, Captain Michael A. Egan, JAGC.

For Appellee: Captain Robert W. Clark, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Major James L. Pohl, JAGC, Captain Gregory T. Baldwin, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Kenneth T. Grant, JAGC.

Before CREAN, MORGAN, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT

MORGAN, Judge:

Appellant was tried at a general court-martial before a panel composed of officer members. Contrary to his pleas, he was convicted of failure to obey a lawful order, maltreatment of a subordinate, rape, adultery, and indecent assault, in violation of Articles 92, 93, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 920, and 934 (1988) [hereinafter UCMJ]. He was sentenced to a dishonorable discharge, confinement for sixteen years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority, consistent with a post-trial request for clemency, reduced the period of confinement to ten years, but otherwise approved the sentence as adjudged.

Before this court the appellant contends, inter alia, that the evidence was insufficient as a matter of law to support his conviction on the rape charge, and that the performance of his civilian lawyer was so deficient that it constituted ineffective assistance of counsel. Although these issues are forcefully argued, we are compelled to resolve them against the appellant.

### I.

Three female enlisted soldiers, recent graduates of Advanced Individual Training (AIT), were enroute to undetermined units in Europe when they first encountered the appellant, who was an Assistant Noncommissioned Officer (NCO) in Charge of a Replacement Control Station at Rhein Main Air Base in Frankfurt, Germany, to which the soldiers were temporarily assigned. During the period of 6–9 July 1991, the appellant had required each soldier to report at a different time to an unoccupied room on the third floor of the Replacement Battalion barracks, where most of the sexual offenses occurred.

The only element at issue on the rape charge was whether the act of sexual intercourse was committed by force and without consent.

The victim of the rape testified that on her first day in Germany she saw the appellant, who was in uniform, at a briefing for new arrivals. During a break the appellant had corrected her on her uniform. After being released, the victim was in her room on the first floor of the barracks, changing into her Battle Dress Uniform, when the appellant came into the room and told her she had to return at 1900 hours instead of 2100 hours, as originally scheduled. She reported to the appellant's office at 1900 hours. The appellant, who was then dressed in shorts and a "fishnet" top, directed her to follow him to a third floor room in the barracks, where she "thought I had to do some kind of detail like mop the floor or clean the rooms." Once in the room, they started talking, and the conversation eventually turned to the subject of sex, which made the victim feel uncomfortable. She then went to the bathroom and, in the following testimony, described what happened next:

> He followed right behind me. I turned around in the bathroom and he started kissing me and putting his arms around me. I told him, "No," I didn't want to do anything, you know. I had an idea that that's what he was getting to, so I said, "No," I didn't want to do anything. And he kept doing it and he told me to relax, that he wasn't going to hurt me or anything.
>
> . . . .
>
> He kept telling me to relax, that he wasn't going to do anything. He pulled down my pants and I tried to pull them back up. He pulled them back down. And he just picked me up and sat on the toilet.
>
> . . . .
>
> He'd unzipped my belt and just pulled my pants apart and pulled them down. Then, he picked me up and put me on the toilet and I was facing the wall and my right was facing him. Then, he put his fingers in me and I tried to back him away. . . . you know, push his hand away. I kept saying, "No." And at that time, I

basically knew what was going to happen. But, I didn't know what to do, I was panicking. You know, I was thinking, what can I say. I was trying to talk it out—"Look, I don't want to do anything."

> And then, he picked me up and put me on the first bed that was closest to the bathroom [witness weeping].
>
> . . . .
>
> When we got to the bed, he laid me down. My head was facing the TV, it wasn't where the pillows are on the bed. It was on the opposite end of the bed. And he took my boots off—he just yanked my boots off and took my pants down. He got on top of me and he tried getting my shirt off. Then, he got my BDU top off. He took my T-shirt off, unhooked my bra and got in-between me. I tried to put my legs together and tried to push him off, that's when he did it.
>
> . . . .
>
> He got right between them and I couldn't . . . there was nothing I could do. And he just pulled them apart and got between my legs.
>
> . . . .
>
> I was panicking. I didn't know what to do, you know.
>
> . . . .
>
> I didn't want to scream or hit him, because I was afraid he was going to hit me back, you know. I was afraid I was going to get hurt.
>
> . . . .
>
> He got up and got dressed and he left the room. He said he'd be right back. And I got up, got dressed and I tried to get out of the door, but I couldn't. I was shaking really bad and I couldn't get the lock open. By that time, he came back up.
>
> . . . .
>
> And I followed him out. And when we were in the hallway, he said, "You're not going to tell anybody, are you?" And I said, "No."

## II.

The test for legal sufficiency of the evidence is whether, considering the evidence

in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether we are ourselves convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). We hold that the evidence of record in this case satisfies both tests.

In *United States v. Clark*, 35 M.J. 432 (C.M.A.1992), the Court of Military Appeals found constructive force when a senior NCO, who occupied a position of authority over a female private, ordered her into an isolated area within a small shed and positioned his body between her and the door. The victim had testified that she was frightened, and feared that she would be harmed if she offered anything other than passive resistance.

Here we have more than a mere *Clark* scenario. The victim's testimony establishes that she clearly manifested her lack of consent to appellant's forceful act of sexual intercourse. She said "no" several times, pulled her pants back up after the appellant first pulled them down, pushed the appellant away, and tried unsuccessfully to hold her legs together as the appellant forcibly pulled them apart. She was "panicking," and feared that the appellant, a virtual stranger who substantially outweighed her,[1] would harm her if she screamed or resisted any further. Under these circumstances, even without the appellant's obvious exploitation of his rank and position, she was not required to do more. Manual for Courts–Martial, United States, 1984, Part IV, para. 45c(1)(b); *United States v. Watson*, 31 M.J. 49 (C.M.A.1990); *United States v. Bonano–Torres*, 31 M.J. 175 (C.M.A.1990); *United States v. Barboza*, 39 M.J. 596 (A.C.M.R. 31 Jan. 1994).

We are convinced beyond a reasonable doubt that the evidence establishes both force and lack of consent, and that the appellant was properly convicted of rape.

## III.

■ Appellant also alleges a number of deficiencies regarding the performance of his civilian defense counsel. Appellate defense counsel, both military and civilian, focus primarily on what they perceive to be a failure to recognize and properly raise a speedy trial issue to illustrate this alleged denial of effective assistance of counsel. Their perception, however, is based upon an erroneous interpretation of Rule for Courts–Martial 707 [hereinafter R.C.M.].

Under R.C.M. 707(a)(1), an accused must be brought to trial within 120 days after preferral of charges. The charges against the appellant, who was never under any form of pretrial restraint, were preferred on 19 September 1991. *"ON DAY NUMBER 1, EVERYONE ASSOCIATED WITH A CASE SHOULD KNOW WHAT DAY WILL BE NUMBER 120."* United States v. Carlisle, 25 M.J. 426, at 428 (C.M.A.1988). The 120th day in this case would have been 17 January 1992. The appellant was arraigned on 15 January 1992. Consequently, even if every pretrial delay in this case were charged to the government for accountability, including those requested in writing by the defense, the appellant was brought to trial within the meaning of R.C.M. 707(b)(1) on the 118th day after the charges were preferred, in full compliance with the express terms of the rule.

Appellate defense counsel argue, however, that the rule should not be applied according to its plain meaning, because the government was not prepared to proceed on the arraignment date with evidence on the merits. They cite no authority for this proposition, other than the argument that a speedy arraignment does not equate to a speedy trial.

Although an arraignment consists merely of reading the charges and specifications to the accused and calling on him to plead, it is not an insignificant phase of the trial. It is conducted at a formal session by a military judge pursuant to Article 39(a), UCMJ.[2] Typically, it is at this stage of a court-martial proceeding where major issues are resolved, such as the accused's right to counsel, choice

---

1. The victim testified that she weighed 101 pounds. The court members could observe the accused, who weighed anywhere from 176 to 193 pounds according to the allied papers.

2. The accused may not be arraigned at an informal conference under R.C.M. 802. R.C.M. 904 discussion.

774

of forum, litigation of motions, tentative pleas, and docketing of a mutually acceptable trial date. There is no requirement for the introduction of any evidence at this session, but it clearly signals to the accused that his trial has begun, since no additional charges may thereafter be referred for trial with those upon which he has been arraigned. It is clearly a part of the trial[3] and logically the point at which the speedy trial clock should stop.

Accordingly, we decline the appellate defense counsel's invitation to carve a judicial exception to such a clear, unambiguous, and simple rule, and find nothing deficient in the civilian defense counsel's performance by his failure to extend such an invitation to the trial judge.

Likewise in this regard, the appellant's contention that his civilian defense counsel's failure to consult with and advise him during the course of the trial "raises significant questions" of [his] assistance in this case, provides no basis for relief on appeal. There is nothing, either in this record or submitted by the appellant, to overcome the strong presumption of adequate representation established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Crum*, 38 M.J. 663 (A.C.M.R.1993). Even the appellate defense counsel concedes that, "[t]rial defense counsel in the case at bar indeed did perform ably in many respects."

### IV.

We have carefully considered the remaining assertions of error, to include the extensive matters raised personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them also to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge CREAN and Judge GONZALES concur.